# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DONTRELL JOHNSON,

        Plaintiff,

    v.

WILLIAM POLLARD, PETE ERICKSON,
JEAN LUTSY, WILLIAM SWIEKATOWSKI,
MICHAEL BAENEN, SARAH COOPER,        Case No. 08-CV-297
CO II VANLOO, JEANANNE ZWIERS,
CO II STEUDEL, CO II ZUGE,
and CO II RHOADES,

        Defendants.

# DECISION AND ORDER

The plaintiff, a Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He was granted leave to proceed *in forma pauperis* on Eighth Amendment conditions of confinement and deliberate indifference to a serious medical need claims, and a retaliation claim. Before the court are the defendants' motion for summary judgment, the defendants' motion for leave to file excess pages, and the defendants' motion to strike plaintiff's response to defendants' findings of fact.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving part." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."). "Rule 56(c) mandates the entry of summary judgment, ... upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## II.  FACTS[1]

### A.     PARTIES

The plaintiff, Dontrell Johnson (Johnson), was incarcerated at Green Bay Correctional Institution (GBCI) from March 14, 2006, through February 10, 2009.  He was housed in segregation from October 29, 2007, through September 4, 2008.  On February 10, 2009, Johnson was released from prison and is currently on active community supervision.  The defendants are all employed at GBCI.  William Pollard is Warden; Peter Ericksen is Security Director; Jean Lutsy is a Nurse Clinician 2; William Swiekatowski is a Supervising Officer 1; Michael Baenen is Deputy Warden; Sarah Cooper is a Corrections Program Supervisor; Jeananne Zwiers is a Nursing Supervisor 2; and Brian Vanloo, Nickolas Steudel, Todd Zuge, and Michael Rhoades are Correctional Officers.

### B.     CONDITIONS OF CONFINEMENT CLAIM

#### 1.     Gnats

According to the defendants, from time to time, usually in the spring, GBCI had a problem with gnats in the shower drains located in some of the cells on the segregation unit.  Defendant Swiekatowski was aware that Johnson and other inmates complained about gnats in the shower drains.  When he received such complaints, Swiekatowski ordered security staff to pour bleach down the shower drains, which cleared the drains and killed the gnats, although sometimes bleach

---

[1]Facts are taken from the Defendants' Proposed Findings of Fact and the Affidavit of Dontrell Johnson.

had to be used more than once to clear up the problem.  On April 23, 2008, a correctional officer poured bleach in Johnson's shower drain.  Swiekatowski also requested the maintenance department to pressure spray the shower drains.  In addition, on March 13, 2008, Wil-Kil Pest Control applied a pesticide over the entire unit.

Johnson claims that there was an ongoing problem with insects which continued for months with little interest from staff, and that he complained multiple times.  (Johnson Aff. ¶ 13).  He estimates that there were several hundred gnats flying in the air at any given time and that he found them in his food, clothing and bedding.  (Johnson Aff. ¶ 11).  Johnson avers that he was bitten by the insects at various times, causing itching and sensitivity to his skin but that nursing staff labeled the bites as acne.  (Johnson Aff. ¶ 17).

### 2.    Cell Temperature

Johnson was housed in cell 436 from February 23, 2008, through June 13, 2008, except for one day in April when he was placed in observation status.  GBCI maintenance personnel monitors the inside temperatures of all buildings on the grounds to ensure a comfortable temperature is maintained throughout the year.  However, cell 436 is located at the end of a segregation wing and can get a little colder than other cells.  Inmates, including Johnson, who are housed in the end cells of the segregation wings are provided with three blankets to compensate for the cooler temperatures.  Between February 2008 and July 2008, Johnson was seen in the Health Services Unit (HSU) on at least eleven occasions.  He did not complain

about symptoms related to having a cold or becoming sick due to being housed in a colder than normal cell during any of these visits.

Johnson avers that cell 436 in segregation was extremely cold, that he could see frost on the cell windows, and that at night he could see his breath. (Johnson Aff. ¶¶ 20, 26). He avers that he received three extra blankets but they were of low quality and thermal ability, and contained many holes. (Johnson Aff. ¶ 22). Johnson was unable to sleep, exercise or walk around and was confined to his bed wrapped in the blankets. (Johnson Aff. ¶ 24). He suffered muscle aches and headaches due to the cold. (Johnson Aff. ¶ 25).

### 3. Polish Sausage Injury

On March 11, 2008, Johnson cut his lip on food. Incident Report Number 1215506 was written and a copy was given to the Food Services Administrator. On the same day, a correctional officer contacted HSU and informed the nurse on duty about the incident, and also advised that there was no active bleeding. The HSU nurse advised there was no obvious emergency and if Johnson wanted to see HSU, he should submit a written request. On March 13, 2008, Johnson was seen by nursing staff related to his cut lip. The nurse observed slight puffiness on his lower lip and suggested that he rinse his mouth with salt water. Johnson avers that he is aware of specific instances of foreign objects found in the food, yet GBCI continues with the same vendor. (Johnson ¶ 70).

## C. MEDICAL CARE CLAIMS

### 1. Head and Chest Pains

On July 18, 2007, Johnson was seen in HSU and complained of chest pains. Nursing staff conducted an examination, which included taking Johnson's vital signs and listening to his heart. No irregular heart rhythms were detected, and his lungs were clear. Mintox tablets (antacids) were provided to Johnson, and he was advised to follow up with HSU if symptoms of chest pain persisted. Johnson was seen in HSU on August 31, September 4, October 29, November 7, and November 23, 2007, and he had no complaints of chest pain during any of these visits. On December 20, 2007, Johnson was seen in HSU with complaints of head and chest pain. His vital signs were taken. Johnson reported antacids previously given were effective. He was instructed to use Ibuprofen/Acetaminophen with Sudagest and Mintox tablets.

On January 22, 2008, Johnson requested health services related to head and chest pains, and the next day Nurse Lutsy saw him in HSU. Johnson's vital signs were taken, and he was scheduled to see the GBCI physician. On January 25, 2008, Johnson was seen by the physician and he complained of chest pain. The physician noted no general distress and his initial assessment was "probable non cardiac pain." He ordered an electrocardiogram, laboratory work-up, chest x-ray, blood pressure checks, and MD follow-up. The work-up ordered by the physician was completed on February 21, 2008.

On February 22, 2008, Johnson was seen in HSU by the GBCI physician related to chest pain. Johnson did not complain to the physician about head pains at that time. The physician provided him with the results of the laboratory tests, x-ray, and electrocardiogram. On that day, the physician diagnosed Johnson with non-cardiac pain and ordered a prescription of Naproxen to be taken for six months which Johnson started on March 4, 2008.

On March 2, 2008, Nurse Lutsy met with Johnson in HSU at which time he inquired about the results of his EKG and the medication order (Naproxen). Lutsy reviewed the EKG findings and physician notes with Johnson, and told him that she would check to see if the Naproxen arrived. Lutsy reminded Johnson that he had Ibuprofen to take until the Naproxen arrived, but told him to stop the Ibuprofen once the Naproxen started.

On June 3, 2008, the GBCI physician ordered that the Naproxen be discontinued and that Johnson start a different medication pain reliever, Sulindac, after Johnson complained that the Naproxen did not alleviate his pain.

On June 15, 2008, Johnson submitted a health services request complaining of chest pains. He was seen in HSU on June 23, 2008, but denied any discomfort on that date. On July 8 and 22, 2008, Johnson was seen in HSU, and he had no complaints of chest pain on these dates.

Johnson disputes that Lutsy or other nursing staff listened to his heart or lungs during the examinations, and that only his blood pressure was taken. (Johnson Aff.

¶ 62).  He also avers that he did complain of head and chest pains to the doctor on February 22, 2008.  (Johnson Aff. ¶ 65).

## 2. Acne

On April 23, 2007, Johnson complained of skin acne and Nurse Lutsy gave him Betasept because he had visible signs of acne.  Lutsy saw Johnson in HSU on April 30, May 23, and May 31, 2007, and he had no complaints related to acne or any skin condition.  On August 31, 2007, Johnson requested that the Betasept prescription be renewed.  He complained of lesions on his chest but the nurse documented that his skin appeared healthy with no signs of active pimples or pustules.  Johnson was instructed to use antibacterial soap from the canteen and his supply of Betasept was not renewed.

Lutsy saw Johnson in HSU on November 7 and 23, 2007, January 23, 2008, and February 5, 2008.  He did not complain about his skin on any of those occasions.  On March 2, 2008, Lutsy noted mild acne and gave Johnson Betasept for cleansing.  On March 26, 2008, Johnson requested daily showers for acne.  Lutsy noted very mild acne of anterior and posterior torso and no signs or symptoms of infection.  Lutsy did not approve daily showers, but she gave Johnson Betasept cleanser.

On April 6, 2008, Johnson requested to be seen by HSU staff regarding a bug bite.  On April 8, 2008, he refused to come out of his cell to be taken to HSU so nursing staff came to his cell, saw a pimple under his left eye, and advised him to apply a warm compress to the pimple.  On April 28, 2008, Johnson complained of

-8-

acne across his back, shoulders, and chest and Lutsy gave him Betasept. On May 2, 2008, the GBCI physician ordered showers four times a week for one month, and also ordered Betasept for acne for six months.

On May 16, 2008, Johnson requested to be seen by HSU staff regarding bug bites. He was seen in HSU on May 22, 2008, complaining that a bug bit him on his chest. Nursing staff examined Johnson and found a pimple on his chest. No swelling or puffiness was noted in the area. Johnson was advised to use good hygiene. On June 5, 2008, Johnson requested renewal of extra showers but the GBCI physician determined no extra showers were necessary.

Johnson avers that on March 2 and 26, 2008, he saw nursing staff but was only provided daily showers, not the Betasept soap. (Johnson Aff. ¶ 37). He also avers that on April 30 and May 31, 2007, he saw HSU staff and brought to their attention medical problems related to his skin. (Johnson Aff. ¶ 38). Johnson further avers that he showed Lutsy and HSU staff his skin related problems on April 30, May 31, November 7, and November 23, 2007, and on February 5, 2008. *Id.*

### 3.   Blood Pressure

Johnson's vital signs, including blood pressure, were checked on a regular basis between March 2006 through July 2008. Some of his blood pressure readings were elevated, but not on a consistent basis. Johnson has not been diagnosed with hypertension by a GBCI physician, nor has he been placed on hypertension medication to lower his blood pressure. Based on Lutsy's professional nursing experience and knowledge, Johnson's blood pressure was not a serious medical

condition. An occasional isolated higher than normal blood pressure reading is not a serious medical condition. On January 25, 2008, the GBCI physician ordered blood pressure checks to be conducted weekly for four weeks. Johnson's blood pressure was taken on January 25, February 5, February 14, February 21 and February 22, 2008. Blood pressure checks continued on at least a monthly basis through July 2008.

### 4. Missed Medication

On January 9, 2008, Officer Zuge inadvertently missed Johnson during the scheduled 10:00 a.m. medication pass. As of January 9, 2008, Johnson was prescribed the following medications: Trazodone (for sleep) at bedtime; Fluoxetine (antidepressant) daily at noon; and Mintox (antacid) four times a day as needed. The January 2008 Medication Record indicated that Johnson refused the 6:00 a.m., 10:00 a.m., and 3:00 p.m. doses of Mintox. The January 2008 Medication Record also does not indicate that Johnson received a noon dose of Fluoxetine. Based on Lutsy's professional nursing experience and knowledge, the one missed dose of Fluoxetine would not create a serious medical need nor cause him any injury or serious harm. At no time on January 9, 2008, did Officer Zuge intentionally deny Johnson medical services or medication.

On March 1, 2008, Johnson refused to take his night-time medication dose, although he requested Ibuprofen, which Officer Vanloo did provide to him. Vanloo advised the segregation unit supervising officer, and he noted the refusal on Johnson's medication chart. Vanloo did not deny Johnson medical services, nor did

he knowingly cause Johnson any injury or serious harm due to his actions on this date.

On April 2, 2008, Johnson refused to take his 6:00 a.m. and 10:00 a.m. medications. Vanloo advised the segregation unit supervising officer, and the refusal was noted on Johnson's medication chart. Vanloo did not deny Johnson medical services, nor did he knowingly cause Johnson any injury or serious harm due to his actions on this date.

In March 2008, Johnson refused the majority of his noon medication doses of Fluoxetine, and refused the majority of his night-time doses of Trazodone. In April 2008, Johnson frequently refused the 6:00 a.m. and 10:00 a.m. medication doses of Fluoxetine and Naproxen.

On May 7, 2008, Vanloo went to Johnson's cell and advised him of an appointment with the psychiatrist. Johnson refused to come out of his cell to be escorted to the appointment. Vanloo notified clinical services that Johnson refused his appointment with the psychiatrist. Vanloo did not deny Johnson medical services on this date.

Johnson avers that at no time on January 9, 2008, did he refuse his medications. (Johnson Aff. ¶ 52). Johnson further avers that on March 1, 2008, Vanloo was passing out evening medication and deliberately "skipping" his cell. (Johnson Aff. ¶ 78). Johnson called out to him to get his attention and let him know he skipped his cell, but Vanloo just looked at his cell, smiled and continued with his medication route. *Id.* Johnson also avers that Vanloo came to his cell and asked

Case 2:08-cv-00297-JPS   Filed 09/16/09   Page 11 of 34   Document 81

him to see the psychiatrist on a scheduled visit, and Johnson answered yes. (Johnson Aff. ¶ 95).  However, Vanloo then left the cell, and Johnson did not get to see the psychiatrist.  *Id.*

### 5.    Optometry

GBCI has an on-site optometrist who works part-time, one to two days per month.  There is typically a one to three-month wait to see the optometrist after an inmate submits a Health Services Request.   On January 14, 2008, Johnson requested to see the eye doctor, he was placed on the optometry waiting list, and the next available appointment was scheduled for April 24, 2008.  At the time of Johnson's request, there were no records in his file indicating that he had a medical history of eye-related health problems. Inmates are not advised of the date for medical-related appointments due to security concerns.  They are typically called for the appointment on the date and hour of the appointment.

When Johnson saw the optometrist on April 24, 2008, there was a change in his eye sight from his last eye examination in 2005.  The optometrist noted to hold changing the prescription, ordered a re-check in two months, and noted the change could be from medications.  A re-check was conducted on July 24, 2008, and glasses were issued to Johnson on August 5, 2008.

Between January 14, 2008, and April 24, 2008, Johnson was seen by HSU staff for health services on January 23, January 25, February 5, February 22, March 2, March 13, March 26, and April 8, 2008.  At no time during these visits did Johnson complain about eye pain or his vision.

Johnson avers that on January 14, 2008, he filed an inmate complaint due to failure to receive prompt attention to his eye-related problem. (Johnson Aff. ¶ 27). After being told by nursing staff that it would take four to eight weeks to see an optometrist, he wrote medical staff on January 23, January 24, and January 27, 2008. (Johnson Aff. ¶ 30). Johnson avers that when he continued to request assistance, he was directed to stop making such request, and was told, "This has been addressed. This is a direct order to stop writing us about it." (Johnson Aff. ¶ 31). He avers that he did not receive any medical attention from staff until the optometrist examination and that defendant Lutsy refused to discuss the matter with him during appointments scheduled for other matters. (Johnson Aff. ¶¶ 32-33).

### 6.    Emergency Intercom System

On January 21, 2008, Officer Steudel was working in the segregation unit as a wing officer and Officer Rhoades was working in the area where the segregation unit's emergency intercom system is located. As a wing officer, Steudel was responsible for monitoring inmate security, health and safety by walking throughout the wing to listen to inmate complaints, questions, comments, and to make appropriate referrals when required. The emergency intercom system is linked to each inmate cell and is to be used by the inmate by pressing a button inside of his cell to signal a medical emergency to the officers monitoring the system on the unit. When he is responsible for monitoring the emergency intercom system, Rhoades does not leave the work area to personally speak to inmates but rather refers all instances of emergency button use by inmates to the wing officer and unit sergeant.

Call buttons in cells are to be used for medical emergencies only and, when pressed, it flashes a light on the system in security staff's work area, to which security staff are trained to immediately respond by inquiring as to the nature of the medical emergency. During Rhoades' shift on January 21, 2008, Johnson pressed the call button in his cell a number of times. Each time, Rhoades responded and asked Johnson to state his medical emergency, and each time Johnson told Rhoades that his stomach hurt. Johnson did not complain to Rhoades of head or chest pains. On January 21, 2008, Johnson advised Steudel several times that he needed to see the nurse, stating that he was "hurting." Steudel called the HSU and advised on-duty staff that Johnson requested to be seen by a nurse. Steudel was advised that Johnson should submit a Health Services Request form and Steudel relayed this information to Johnson. Johnson never told Steudel that he was experiencing head or chest pains.

On January 29, 2008, Officer Vanloo was working in the segregation unit, and his duties included monitoring the electronic intercom system. On that day, Johnson pushed his medical emergency button on at least three occasions requesting to change the radio channel which is an abuse of the emergency intercom system. On one occasion, Johnson complained of a headache and Vanloo advised the wing officer of Johnson's complaints, who provided Johnson with Ibuprofen and Health Services Request forms.

Johnson avers that on January 21, 2008, he woke up with serious head and chest pains and attempted to get medical attention by asking Steudel. (Johnson Aff.

¶ 53).  He told Steudel that he was suffering from serious chest and head pains and asked to see a nurse but Steudel stated he would have to wait until he could call HSU.  *Id.*  Four hours later, at the nightly medication distribution, Steudel told him to fill out an HSU request form and that it was not a medical emergency.  *Id.*  Johnson further avers that he pressed the medical emergency button and told Rhoades of his situation, the pain he was having, and that he needed to see a medical staff member.  (Johnson Aff. ¶ 54).  Rhoades stated that "there is nothing I can do." (Johnson Aff. ¶¶ 54-55).  Johnson also avers that on January 29, 2008, at 6:45 p.m., he pressed the emergency call button in his cell, Vanloo answered his request to see the nurse due to head pains, but Vanloo stated, "this is not a medical emergency. . . ."  (Johnson Aff. ¶ 74).

### 7. Medication Snack (Crackers)

When inmates are prescribed medications that typically cause gastric irritation, the physician may order the medication to be taken with food to avoid gastric distress, which could potentially lead to ulcers.  The crackers intended to be used as medication snacks are ordered and supplied by the unit's security staff.  A physician ordered that Johnson receive crackers with his medication doses on March 7, 2007 (for six months), and February 22, June 3, and July 16, 2008.

In August 2007, Cooper became aware of a problem where the inmates were abusing the availability of soda crackers and that the supply of crackers on the medication cart was continually running out.  Cooper sent a memorandum to all segregation inmates advising that effective August 13, 2007, over-the-counter

medications such as Tylenol and Ibuprofen needed to be requested with the meal tray and that no soda crackers would be provided. Inmates who had a doctor's order to receive crackers with other prescriptions at the morning, noon or evening medication pass would still receive crackers with their prescribed medication. On or about February 2008, Cooper reviewed the ordering process to ensure that crackers were ordered on an ongoing, regular basis so that crackers were always available to inmates who need them with their medication. All supervisory staff were to ensure that the medication cart is supplied with soda crackers for inmates who are prescribed medications to be taken with food. There is no documentation or objective findings that state missing a medication snack with the medications that Johnson was prescribed to take with food, caused a serious medical need or caused injury or serious harm to him.

Johnson avers that on February 11, 2008, he filed GBCI-2008-4743 surrounding the failure to distribute crackers with medication as ordered by the physician, and that he had contacted both Sarah Cooper and Lt. Swiekatowski about the matter but received no response. (Johnson Aff. ¶ 42). When he did not get the crackers, Johnson suffered from stomach irritation, including stomach pain and vomiting, for several hours after taking the medication. (Johnson Aff. ¶ 41). Johnson notified nursing staff at each appointment that the crackers were not being supplied and Lutsy told him it was an issue with security. (Johnson Aff. ¶ 43).

**D. RETALIATION**

**1. Correctional Officer Brian Vanloo**

Although he does not recall the specific date, Officer Vanloo recalls an incident involving Johnson making a comment to him about grabbing the security keys when Vanloo opened the cell trap door to pass meals or medications. This comment was precipitated by an incident involving another inmate whose arm was caught in the trap door because he was reaching for security keys when the trap door was open. Vanloo advised Johnson that if he tried to grab his keys through the cell trap door, it was possible that Vanloo would shut the trap door to prevent Johnson from taking the keys and Johnson should make sure that his arm was not in the trap at the time it was closed.

On March 10, 2008, Vanloo's duties included passing breakfast meal trays to inmates through the inmate's cell trap door. During the meal pass, Johnson commented to Vanloo about the other inmate who had attempted to grab the security keys when the officer opened the cell trap door to pass a meal tray. Vanloo advised Johnson not to grab the security keys and to be sure to keep his arm away from the cell trap door when it was being closed. Vanloo did not threaten to shut to trap door on Johnson's arm.

On April 3, 2008, Vanloo was working in the segregation unit and his duties on that shift included passing meal trays and medications to inmates. He did not tamper with Johnson's meal tray. Vanloo attempted to pass Johnson his lunch meal tray and Johnson refused to take the tray. Vanloo notified his supervising officer that

Johnson refused his lunch meal tray on April 3, 2008. Vanloo did not subject Johnson to verbal harassment or taunts, nor did Vanloo cause Johnson any injury or serious harm due to his actions on this date. Vanloo advised Johnson that it was his responsibility as wing officer to pass meal trays and medications on his assigned shift, and that inmates do not have choices as to who they interact with on a daily basis, nor do inmates have choices as to the officers who pass them meal trays or medications.

Vanloo did not subject Johnson to any reprisal for his participation in the grievance process. Depending on his assigned duties in the segregation unit, Vanloo had contact with Johnson on a daily basis by passing him his meal trays or medications, or in his capacity as the wing officer.

Johnson avers that he never mentioned he would take the keys of any officer, in any manner. (Johnson Aff. ¶ 82). Johnson further avers that on March 10, 2008, while passing out breakfast meals, Vanloo stated, "Stick your arm out the trap so I can cut your fingers off." (Johnson Aff. ¶ 85). Johnson felt intimidated by Vanloo, due to his threats of physical harm. (Johnson Aff. ¶ 86). Johnson avers that on March 23, 2008, Vanloo again made threats of slamming the trap on his hand/arm. (Johnson Aff. ¶ 89). Vanloo stated, "You better get use to this cuz I work up here everyday." *Id.* Johnson further avers that on April 3, 2008, while passing out meal trays at noon, Vanloo attempted to give him a food tray, not from the food cart. (Johnson Aff. ¶ 92). He refused and asked Vanloo for another officer to provide the food tray. *Id.* Vanloo stated, "You ain't getting shit unless its from me." *Id.*

-18-

## 2. Conduct Report Number 1938729 (Date of Incident: May 21, 2008)

Inmates are prohibited from covering their cell windows or putting anything on their cell windows, window sill, lights, vents, writing on, or attaching anything to the cell walls. Additionally, any misuse of clothing, linens or mattress is prohibited and may result in discipline or restrictions. These rules and restrictions apply to all GBCI inmates and are set forth in the GBCI Segregation Unit Handbook, a copy of which is received by each inmate who resides in the segregation unit.

Defendant Ericksen is responsible for reviewing conduct reports written by security staff, and reviewing restrictions initiated by security staff. When absent from the institution, Erickson designates another security officer to conduct these reviews. Captain Michael J. Delvaux is typically Erickson's designee.

On May 21, 2008, a security officer wrote Conduct Report 1938729 alleging that Johnson violated rules 303.24 (disobeying orders) and 303.28 (disruptive conduct). The officer alleged that Johnson covered his cell window with his bath towel and refused several direct orders before removing the towel from his cell window. Captain Delvaux reviewed Conduct Report 1938729. Ericksen had no personal involvement in the issuance or review of Conduct Report 1938729. A security officer completed form DOC-227 advising Johnson that he was placed on a linen restriction from May 21, 2008, through May 24, 2008, and Captain Delvaux reviewed the linen restriction. Ericksen had no personal involvement in the placement of Johnson on a linen restriction from May 21, 2008 – May 24, 2008, nor did Ericksen have any personal involvement in the review of the linen restriction.

### III. ANALYSIS

As an initial matter, the defendants have filed a motion to strike Johnson's response to their findings of fact as untimely filed. Johnson's response to the defendants' summary judgment motion was due on or before May 11, 2009. (It was originally due on March 27, 2009, but the court granted him additional time.) Johnson filed several documents that appear to be part of his response, on three different dates. Two of the documents were filed prior to the time that the defendants filed their reply brief. Those are the Affidavit of Dontrell Johnson (Docket #70) which was filed on May 8, 2009, and Plaintiff's Motion in Opposition to Defendants' Request for Summary Judgment (Docket #71), which is actually a response brief, filed May 13, 2009. The following documents were filed on May 19, 2009: Plaintiff's Motion in Opposition to the Defendants' Motion for Summary Judgment (Docket #75), Plaintiff's Response to the Defendants' Findings of Fact (Docket #76), Affidavit of Terry D. Mueller (Docket #77), and a Certificate of Service (Docket #77). The Certificate of Service indicates that Johnson "placed the following documents, motion and brief in support of motion in opposition to the defendants' request for summary judgment, Plaintiff's findings of facts . . ., cover letter and certificate of service, properly affixed to allow for first class postage via the USPS[.]" The Certificate of Service does not indicate on which day the documents were placed in the mail, however it was signed on May 9, 2009.

In support of their motion to strike Johnson's response to their proposed findings of fact, the defendants assert that they were in the middle of drafting their

reply brief when Johnson filed the response brief, which was not entered until May 15, 2009, and which they received in the mail on May 18, 2009. The defendants revised their reply brief. Then, on May 19, 2009, they received Johnson's response to their proposed findings of fact and they request that this filing be stricken because their reply brief had already been filed, and allowing Johnson's untimely response to their proposed findings of fact would be prejudicial to them. The defendants assert that Johnson was already granted an extension of time and that he did not file a timely request for additional time.

In response, Johnson filed a letter on May 26, 2009 (Docket #79), in which he refers to a prior letter that he filed on May 18, 2009 (Docket #73). The previous letter, dated May 14, 2009, was written to inform the court that Johnson's legal mail was being withheld at Milwaukee Secure Detention Facility which could cause him to be late for deadlines. The letter goes on to say that before May 11, 2009, he mailed out documents in response to the defendants' motion for summary judgment, including his motion in opposition to summary judgment, Affidavit of Dontrell Johnson, Affidavit of Joseph Hudson, Affidavit of Allen Tony Davis, Affidavit of Michael Thomas, Affidavit of Anthony Littlewolf, Affidavit of Antonio Green, and Affidavit of John Egerson.

Under the "mailbox rule," *see Edwards v. United States*, 266 F.3d 756, 758 (7th Cir. 2001), papers filed by a prisoner are deemed filed on the date they are given to prison authorities for mailing. In this case, it is not clear that Johnson placed all of the filings that, apparently, make up his response to the defendants'

Case 2:08-cv-00297-JPS   Filed 09/16/09   Page 21 of 34   Document 81

motion for summary judgment in the prison mailbox on or before May 11, 2009. Although his Certificate of Service is dated May 9, 2009, and this could be construed as meaning that documents were given to prison authorities for mailing on that date, one of his filings is dated May 11, 2009, which makes that inference implausible. Thus, the mailbox rule does not apply.

In any case, striking Johnson's response to the defendants' proposed facts is not especially prejudicial to him because his affidavit was timely filed and is taken into consideration in resolution of the defendants' motion. And, for the most part, Johnson's response to the defendants' facts cites to his affidavit. In their reply brief, the defendants assert that all of their facts are deemed undisputed under Civil Local Rule 56.2 (E.D. Wis.) because no response to them was filed. However, the court is authorized to look at the whole record, including evidence not cited in the proposed findings of facts or response thereto. This practice is especially helpful in *pro se* cases, where an unrepresented party is less likely to file a response to proposed finding of facts as contemplated by the Local Rules. In this case, the court looks to Johnson's affidavit compared with evidence presented by the defendants' proposed facts. However, Johnson's response to the defendants' proposed findings of fact will be stricken.

## A.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

The defendants contend that the court should dismiss all of Johnson's counts that were not fully exhausted. Specifically, they contend that the following inmate complaints were not properly exhausted before Johnson filed suit on April 9, 2008:

GBCI-2008-9800, GBCI-2008-8974, GBCI-2008-8794, GBCI-2008-10853, GBCI-2008-10854, GBCI-2008-10312, GBCI-2008-10315, GBCI-2008-12102, GBCI-2008-11464, GBCI-2008-13336, GBCI-2008-13223, GBCI-2008-16076, GBCI-2008-16665, GBCI-2008-16341, GBCI-2008-16664, GBCI-2008-16077, and GBCI-2008-11462.

Johnson concedes that he did fully exhaust GBCI-2008-11462. With respect to the remaining sixteen inmates complaints, Johnson contends he believes they were administratively exhausted and should be accepted by the court. He asserts that several of his inmate complaints were filed after he filed this lawsuit yet provide significant supporting information as to the original complaint of harassment and retaliation. If the court deems these inmate complaints unexhausted, Johnson asks that the court accept them in support of the complaint itself.

The Prison Litigation Reform Act of 1995 (PLRA), Pub.L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 548 U.S. 81, 87-88, 93 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004)).

In this case, Johnson filed the original complaint on April 9, 2008. The court screened the original complaint and granted Johnson leave to proceed on Eighth Amendment conditions of confinement and deliberate indifference to a serious medical need claims, and a retaliation claim. On June 23, 2008, Johnson filed his proposed amended complaint, which did not add new defendants or claims but rather expanded on the three legal claims upon which he is proceeding, which are identified in the original complaint, by adding new and recent allegations relative to those claims.

Under the PLRA, a prisoner must exhaust administrative remedies before filing suit. *See* 42 U.S.C. § 1997e(a). A prisoner "may not file a lawsuit before exhausting his administrative remedies, even if he exhausts those remedies while the litigation is pending." *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005). This requirement comports with the PLRA's purpose of alerting prison officials to perceived problems and enabling them to take corrective action without first incurring the hassle and expense of litigation. *Id.* An exception to this rule exists where fully

exhausted claims could be raised by amending an already pending complaint, in lieu of initiating a new proceeding. *See id* at 719-20 (prisoner exhausted administrative remedies by raising fully exhausted claims by amended complaint in already pending civil rights case rather than initiating entirely new proceeding, even though pending case predated exhaustion of remedies on newly added claims); *see also Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005) (filing amended complaint was "functional equivalent" of filing new complaint). Five of the seventeen inmate complaints were fully exhausted before Johnson filed his amended complaint.[2] Although these offender complaints do not add new claims, but rather build on existing claims, Johnson should be able to proceed based on the allegations set forth in those offender complaints. A review of the list of offender complaints filed by Johnson reveals that, prior to commencing this action, he fully exhausted offender complaints related to his Eighth Amendment conditions of confinement claims,[3] his Eighth Amendment deliberate indifference to a serious medical need claims,[4] and retaliation claims against defendant Vanloo.[5]

---

[2] (1) GBCI-2008-10853: complains of not being scheduled to see eye doctor; (2) GBCI-2008-12102: complains of Lt. Swiekatowski's actions; (3) GBCI-2008-11464: complains that there still are gnats in his shower drain; (4) GBCI-2008-13336: complains of the conditions of his cell; and (5) GBCI-2008-13223: complains of CO VanLoo's actions.

[3] (1) GBCI-2008-3838: complains of gnats in shower drain; (2) GBCI-2008-7908: complains that there was a bone in his food; and (3) GBCI-2008-8339: too cold in cell.

[4] (1) GBCI-3008-2105: complains that he cannot get his medications; (2) GBCI-2008-2888: claims he was denied medical treatment; (3) GBCI-2008-3542: complaint of CO VanLoo's actions; (4) GBCI-2008-4743: complains of SEG unit running out of crackers to be give with meds; and (5) GBCI-2008-6774: complains of CO VanLoo's actions.

[5] (1) GBCI-2008-7752: complains of CO VanLoo's actions; and (2) GBCI-2008-8143: complains of CO VanLoo's actions.

With respect to the twelve offender complaints that were not fully exhausted before Johnson filed his amended complaint, he may not proceed on allegations set forth in those claims.[6] For the most part, "dismissing" these offender complaints is pointless because Johnson is already proceeding on his three claims and whether or not to include an offender complaint does not affect the claims. In addition, several of the offender complaints are not related to his claims in this action. In any case, because such offender complaints were not fully exhausted before Johnson filed his amended complaint, they will not be considered.

## B. CONDITIONS OF CONFINEMENT

The defendants contend that the undisputed facts demonstrate that Johnson's Eighth Amendment rights were not violated by his conditions of confinement because the conditions were not sufficiently serious to violate the Eighth Amendment. Johnson contends that the defendants minimize the significance of the insects in his cell and the amount of time that they were there. According to Johnson, the defendants knew an insect problem existed in the segregation building yet did no preemptive extermination work to correct the issue, they admit that Johnson notified them of the problem several times, they failed to demonstrate that they acted timely and thoroughly to resolve the problem, and that pouring bleach

---

[6](1) GBCI-2008-8794: complains of CO Vanloo's actions; (2) GBCI-2008-8974: complains of gnats in shower drain; (3) GBCI-2008-9800: complains of medical treatment; (4) GBCI-2008-10854: complains of medical treatment; (5) GBCI-2008-10312: complains of no crackers in SEG unit; (6) GBCI-2008-10315: complains of CO VanLoo's actions; (7) GBCI-2008-16076: complains that inmates in SEG unit are not allowed to pass legal work; (8) GBCI-2008-16665: complains that Mr. Ericksen has not responded to his requests; (9) GBCI-2008-16341: complains of medical treatment: (10) GBCI-2008-16664: complains of Ms. Cooper's actions; (11) GBCI-2008-16077: complains of how long it takes to get to use computer in SEG unit; and (12) GBCI-2008-11462: complains that SEG still doesn't have crackers.

down the drain was ineffective in treating the problem.  Johnson contends the temperature in the cell in which he resided was excessively cold and the extra blanket he was given did not effectively address the problem.  With regard to the polish sausage incident, Johnson contends that the defendants had prior knowledge of problems with meat items containing foreign objects, and the failure of the institution to correct the problem which has been experienced multiple times by products from the same vendor meets the standard of deliberate indifference.

The Eighth Amendment prohibits cruel and unusual punishment and applies to states through the Due Process Clause of the Fourteenth Amendment.  *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (citing *Robinson v. California*, 370 U.S. 660 (1962)).  To prevail on his Eighth Amendment claim, Johnson must show that the conditions he was subjected to denied him "the minimal civilized measure of life's necessities."  *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Johnson must also show that the defendants acted with a culpable state of mind:

> [A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

*Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)).

Prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation.  *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (allegation of "sixteen months of

infestation and significant physical harm" stated claim for inhuman conditions of confinement)). In *Sain*, a civilly committed sex offender alleged that during his approximate six-year confinement, he often saw "several" cockroaches crawling in his cell and that he was bitten by a cockroach twice during his time in detention. *Id.* at 894. The court found that, although the conditions were "certainly unpleasant" and that the state did not deserve praise for permitting them to persist, a reasonable jury could not conclude that they were objectively serious enough to establish a constitutional violation. *Id.*

In addition, prisoners have an Eighth Amendment right to adequate shelter, including a right to protection from the cold. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (reversing summary judgment for defendants on Eighth Amendment claim that prison officials knew of and did nothing to correct cells where water froze on walls, average temperature was 40 degrees, and standard-issue clothing and bedding were insufficient to keep extremities warm). To assess whether cold cell temperatures constitute cruel and unusual punishment, courts must consider factors including "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id.*; *see also Del Raine v. Williford*, 32 F.3d 1024, 1031, 1035-36 (7th Cir. 1994) (reversing summary judgment for defendants on prisoner's claim that being housed in cell with broken windows and no outerwear or blankets when outside wind chill was below zero violated Eighth Amendment); *Henderson v. DeRobertis*, 940 F.2d 1055, 1058

(7th Cir. 1991) (finding that deprivation of blankets for four days in extreme cold could constitute Eighth Amendment violation).

In this case, it is undisputed that Johnson had gnats in his cell, that at times his cell was colder that normal, and that once he bit into a bone in his polish sausage and cut his lip. Based on the case law above, it is dubious whether such conditions constitute an extreme deprivation. In any event, it is also undisputed that the defendants attempted multiple times and in various ways to get rid of the gnats, and that Johnson was provided with three blankets to combat the cold in his cell. There is no doubt that Johnson was not satisfied with these remedies. However, such actions do not support a finding of deliberate indifference. Accordingly, Johnson's conditions of confinement claim will be dismissed.

## C.    MEDICAL CARE

The defendants contend that the undisputed facts demonstrate that they were not deliberately indifferent to Johnson's health or safety in violation of the Eighth Amendment. Johnson contends that, with regard to his head and chest pains, the defendants were deliberately indifferent by not providing medical services and responding to his distress "in any manner indicative of a professional response." (Pl.'s Resp. Br. at 10-11). Johnson acknowledges that he was seen more than once by HSU for the same ailment, but believes that the continuous claim for the same ailment represents a persistence of an undiagnosed issue and, as such, deserved more careful deliberation in this matter. Johnson further contends that defendant Zuge was deliberately indifferent to his serious medical need when he intentionally

refused to give him his 10:00 a.m. or 12:00 p.m. medication on January 1, 2008, resulting in stress, extensive headaches, stomach upset, and muscle aches. Johnson also contends that the defendants were deliberately indifferent because they failed to promptly treat his eye problem. According to Johnson, he first complained about his eye-related problem on January 14, 2008, that he was experiencing vision loss and vision strain, and that he was told by nursing staff that it would take four to eight weeks to see an optometrist. Johnson was repeatedly told that he was on the waiting list, there was a significant decrease in vision leading to the issuance of prescription lenses, and he finally received medical attention on April 24, 2008. Next, Johnson contends that he did not receive appropriate medical attention for his skin condition because he did not receive daily showers. Johnson also contends that the fact that the defendants control the distribution of crackers and that they failed to order more and maintain a supply over a period of months, demonstrates deliberate indifference.

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Factors that indicate a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez*, 111 F.3d at 1373 (citations omitted). A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or in the unnecessary infliction of pain. *See Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999); *Gutierrez*, 111 F.3d at 1371.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (citing *Farmer*, 511 U.S. at 840-42).

A review of the undisputed facts of this case reveals that Johnson was repeatedly seen for his various medical needs over a significant length of time. The

court will not reiterate each test, visit to the HSU, or medications prescribed over that time. It is undisputed that defendant Zuge inadvertently failed to give Johnson his 10:00 a.m. medication on January 9, 2008. In addition, Johnson avers that defendant Vanloo deliberately failed to give him his evening medication on March 1, 2008. Vanloo denies this. However, it is undisputed that Johnson was not harmed or injured as a result of the missed medication. On this record, no reasonable factfinder could conclude that the defendants were deliberately indifferent to Johnson's serious medical needs.

## D.    RETALIATION

The defendants contend that the undisputed facts do not support a First Amendment retaliation claim against defendant Vanloo because there is insufficient evidence to establish that Vanloo made threatening remarks to Johnson and, even if such remarks were made, there is no evidence that they were motivated by Johnson's inmate complaint. The defendants further contend that, even if retaliatory, the alleged remarks would have only caused a *de minimis* injury and could not sustain a retaliation claim. Johnson contends that it is clear the Vanloo was harassing/retaliating against him for filing grievances against him, that administration failed to protect him from Vanloo's actions, and that the statements and actions by both Vanloo and the administration would lead any person to question his safety.

To prove retaliation, Johnson must show that a protected activity (in this case filing a grievance) was "at least a motivating factor" in any retaliatory action taken by the prison. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If he can

show that retaliatory animus was a factor, then the burden shifts to the defendants to prove that the same actions would have occurred in the absence of the protected conduct. *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

In this case, Johnson has not shown that any action taken by Vanloo was due to Johnson complaining or filing grievances. Although he asserts that it was "clear" that Vanloo was harassing him, the record does not support this assertion. "It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998)). Moreover, to the extent that Johnson claims that Vanloo was threatening and/or harassing him, the alleged threats were not severe enough to infringe his constitutional rights, and simple harassment is not cruel and unusual punishment. *See Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443, 445-46 (7th Cir. 2009).

The defendants also contend that Johnson's retaliation claim against defendant Erickson was not properly exhausted and, even if it were, Erickson is entitled to summary judgment because there is no evidence that he acted in retaliation. Johnson does not challenge the defendants' argument that this claim should be dismissed. Thus, summary judgment will be granted as to this claim. *See, e.g., Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to

summary judgment motions are waived); *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 624 n.3 (7th Cir. 2001) (same).

Accordingly,

**IT IS ORDERED** that the motion for leave to file excess pages (Docket #47) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket #48) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendants' motion to strike plaintiff's response to defendants' findings of fact (Docket #74) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case is **DISMISSED** on its merits together with any costs as taxed by the Clerk of the Court.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 16th day of September, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-34-